Filed 5/23/16  P. v. Hoover CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>GEORGE CLAY HOOVER,<br><br>    Defendant and Appellant. | B260156<br><br>(Los Angeles County<br>Super. Ct. No. TA133379) |

APPEAL from a judgment of the Superior Court for the County of Los Angeles. Michael Shultz, Judge.  Affirmed.

Jeffrey J. Gale, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., and Daniel C. Chang, Deputy Attorneys General, for Plaintiff and Respondent.

———————————————

## SUMMARY

A jury convicted defendant George Clay Hoover of criminal threats, stalking, and causing corporal injury to a person with whom he had a dating relationship. Defendant admitted two prior strike offenses, and the court sentenced him to 20 years eight months in prison. On appeal, defendant contends the court should have granted his Penal Code section 1118.1 motion for judgment of acquittal as to the criminal threats charge, because the prosecution presented no substantial evidence that his statements to the victim caused her to be in sustained fear for her own safety. Defendant also contends his admission of his prior convictions must be set aside because the record does not show the admissions were voluntary and intelligent under the totality of the circumstances.

We find no merit in either contention and affirm the judgment.

## FACTS

The victim in this case, Carmen Winston-Tolliver, lived in Compton with her daughter (Sequoia Miner), her daughter's boyfriend (Antwon Jackson), and her two-year-old granddaughter. She worked as a dispatcher for the Los Angeles Police Department (LAPD), and had done so for 24 years.

The victim began dating defendant in early 2014. The relationship was "rocky from the start" because defendant was "very jealous and possessive." The incidents that culminated in the criminal charges against defendant occurred in April and May 2014.

### The first incident

The victim had a cell phone defendant had given her. Defendant listened to the messages on the cell phone, and became angry when he heard a message referring to the victim's "sexy, yellow ass." They argued, and the victim told defendant, "I don't want to be with you." They "got back together that night," but they continued to argue because defendant "kept bringing up the voice mail."

The following day, April 14, they continued to argue, by phone, about the message. "He was mad at me, sayin' he was going to beat my ass," and that "nobody should be calling that cell phone because he purchased it for me." Defendant told her, "I'm gonna come over there and f--- you up." According to the victim, defendant was

2

"always sayin' that. 'I'm either kill you or I'm gonna f--- you up. I'm gonna beat your ass.' So, that day, he was like, 'I'm gonna come over and stab your ass.' " The victim was not afraid at that time, "because he said it before." She also said she believed him, because "[h]e knew I was off work that day," but she was tired and took a nap.

Defendant woke the victim up "by being at my bedroom window, yellin', 'Carmen, if you don't open the f------ door, I'm comin' through the mother-f------ window." The victim "jumped up. I was scared." (There were fences and two locked gates, to which she had never given defendant a key, surrounding the victim's house.) This "startled the shit out of me. So, of course, I jumped up and I ran to my front door and opened the door."

Defendant was drunk. He came in and they argued, again about the cell phone. Defendant "just didn't want anybody calling," and thought the cell phone "should only be for me and him to use, him to call me and me to call him or my kids." The argument ended when he fell asleep in her bed; "[h]e passed out." According to the victim, "Whenever we would break up, he would threaten me." When he appeared "yellin' at my window," the victim "was petrified, but I opened the door 'cause I didn't want him comin' through my window." After defendant went to sleep, the victim was not "still scared" because "once he went to sleep, he was fine. He was asleep." She woke him up the next morning and told him to leave because she had to go to work.

### The April 15, 2014 incident

The following day, April 15, defendant and the victim were on the phone again, arguing. Defendant "was mad again," and the victim told him, "I don't want to be with you." The victim told him not to come over to her house, but defendant said, " 'I'm comin'. I'm comin'. You better believe I'm comin', and I'm gonna f--- your ass up.' That's when he was – like, he was going to stab me. And I could hear him. He didn't have a car, but I knew he was comin' 'cause I heard him on the train." Defendant "kept calling" both her house phone and her cell phone. She kept telling him not to come to her house, and "[h]e was like, 'Bitch, f--- you. You gonna die.' "

3

The victim told her daughter and Mr. Jackson that " '[defendant] is at it again. He's on his way over. He said he gonna stab me.' " Ms. Miner and Mr. Jackson "got scared" and armed themselves with knives and bats. "And the part that made them really get scared is because [Mr. Jackson] had told [defendant], 'you know what, my daughter is here. Don't come over.' And I could hear [defendant] through the phone sayin', 'F--- you. I'm gonna f------ kill you, too. F--- you and your family. I don't give a f---.' "

Defendant kept calling the victim. "And every time I would answer, he was, like, threatening me, like, 'Bitch, don't hang up the mother-f------ phone on me. I'm on my way. I'm gonna beat your ass when I get there." "He called so many times that my voice message was full, and it holds 45 messages." The victim said she "was scared to death. Like, either he was gonna stab me or I was gonna – I was gonna protect myself."

The victim called 9-1-1, because "if he comes over here, one of us is gonna get stabbed. I'm sick of it." (Tapes of two 9-1-1 calls, one at 4:26 p.m. and one at 6:22 p.m., were played for the jury. The victim told police that her "ex-boyfriend just called and said he's on his way to kill me.")

Ms. Miner was looking out the window, and told her mother when she saw defendant arrive. They called the police for the second time. Defendant knocked on the door, and when the victim did not answer, defendant walked across the street where two neighbors were standing. He handed a neighbor (who has since died) something that the victim believed to be a weapon, and looked like a pocketknife to Ms. Miner and Mr. Jackson. Then, as he was crossing the street, the police detained him. (Deputy Anthony Bautista, who responded to the 9-1-1 calls, said that none of the three (the victim, Ms. Miner or Mr. Jackson) mentioned the knife to him.)

When defendant was detained, he told the police he "was very upset and he felt like either harming himself or harming her." Deputy Bautista listened to a few of defendant's voicemail messages (there were about 10), and saw "over 50" text messages as well. In the voicemail messages, defendant "was angry," but there were "[n]o threats at the time."

4

Deputy Bautista did not arrest defendant, believing that "the best thing to do would be to take him to a mental hospital to be evaluated just to make sure that he is fine."[1]  The victim told Deputy Bautista "she wasn't being threatened at the time, but she felt scared because he kept calling.  But there was nothing there saying that, like, he was gonna kill her or he was gonna do anything like that at the time."  (The victim testified that "[i]f I told the deputies I wasn't scared, it was probably because they were there.  I've been scared.  I mean, if I'm not with him, he's just crazy, so I was always in fear.")  Ms. Miner told Deputy Bautista that she was not in fear; that "it was annoying" and "they were just tired of the phone calls" and text messages.  Mr. Jackson told Deputy Bautista that "he wasn't really in fear."

The next day, someone from the hospital called the victim on behalf of defendant, telling her defendant's location and that he was fine.  Defendant did not call for three days, but after he was released, he starting calling again, over 30 times a day.  The victim did not answer for seven or eight days,  but finally talked to defendant because she missed him.  They resumed their relationship, which was "good, on and off."  Arguments continued, and defendant "would just get crazy" when the victim received calls on her cell phone.  He would "[t]alk shit about beatin' my ass or f------ me up, killin' me.  He didn't want anybody callin' that phone."  The victim did not tell her daughter and Mr. Jackson that she had resumed her relationship with defendant because they were "petrified, so I didn't want them to know that I was back with him."  They found out, and the victim wrote down defendant's address and gave it to Mr. Jackson, "'cause I just didn't trust [defendant]."

### The May 2014 incidents

In May, the victim decided to end the relationship, because "I didn't want the threats,"  and "I had enough of it."  On either May 10 or May 16, 2014, the victim went

---

[1]    Under Welfare and Institutions Code section 5150, a peace officer may, upon probable cause, take a person into custody for evaluation at a designated facility for up to 72 hours when the person, "as a result of a mental health disorder, is a danger to others, or to himself or herself . . . ."  (*Id.,* subd. (a).)

to defendant's apartment in San Pedro to return his garage clicker.**2** They argued about why the victim was ending the relationship, and "then it got volatile where he grabbed me by my neck, threw me up against the wall, told me I wasn't leavin'."

Defendant "was chokin' me" and saying "if he couldn't have me, nobody could . . . ." The victim understood that to mean that he was going to kill her. "[H]e wasn't gonna let me be with anybody else, which he has said – he's said that a lot of times even to a point where he's like, 'I have a bullet with your name on it.' He was so possessive." (At trial, the victim did not remember if defendant made that statement on the day of the assault, saying, "but, I mean, he's threatened me so much.") The victim was "scared" and crying. She could barely breathe, because "he was chokin' my esophagus."

Defendant let go and the victim tried to walk to the front door, but defendant grabbed her by her arm, "tellin' me I'm not going' no mother f------ where, and that's when he drags me into his room," a distance of about 20 feet. He dragged her onto an air mattress, and was "just hitting' me, yellin', cussin', and hittin'." Defendant was punching her, and he kicked her, too. She tried to fight back and get away, but "he's way bigger than me, so he overpowered me." The episode lasted "[m]aybe an hour" or an hour and a half. It ended when the victim told defendant she loved him; she was "telling him what he wanted to hear" so she "could get the hell out of there." Defendant eventually let her go home.

The victim was distraught when she left. She was "glad to be leavin' with my life 'cause, as crazy as he was acting, he had never done that before." She did not call the police or tell her daughter or Mr. Jackson because she was "too embarrassed. I mean, . . . I work for the police." She was "all purple with bruises" and did not want her daughter and Mr. Jackson to see the bruises; she "felt stupid, 'cause I kept goin' back to him, and

---

**2** The testimony is not clear about the date of the assault at defendant's apartment. The information alleges that defendant made criminal threats on or about May 16, 2014; stalked the victim on or between April 1 and May 16, 2014; and inflicted the corporal injury on or about May 10, 2014. The verdict forms reflected those same dates.

my kids didn't want me with him in the first place after he did what he did." (Photographs of the bruises on her back, arm and leg were placed in evidence at the trial.)

Defendant continued to call and text the victim, "threatenin' me when I wouldn't answer the phone." Telephone records showed defendant called the victim 30 times on May 10, and 107 times on May 16. The victim also received 80 or 90 text messages from defendant on the day of the assault. At some point on May 16, defendant told the victim over the telephone that he was going to "put a bullet in [her] head."

When she got home on the day of the assault, the victim called her girlfriend, Rosana Montoya, and told her everything: that defendant had "basically kidnapped me, kept me at his house, beat my ass and wouldn't let me leave, was tellin' me how he was gonna kill me." According to Ms. Montoya, the victim was "scared," "frightened" and crying, and Ms. Montoya was "afraid for her." Ms. Montoya, who also worked for the LAPD as a dispatcher, telephoned a police lieutenant at her place of work and reported everything the victim had told her.

At about 10:00 p.m. on May 16, Deputy Bautista again went to the victim's home, after being notified by the LAPD "to go to the location in regards to a criminal-threats call." He spoke with the victim, who told him that "they got into it over the phone again, and the defendant threatened her to put a bullet in her head." Deputy Bautista testified that "[a]t that point, she said she did not fear for her life." An emergency protective order was issued on that date.

After the incidents in May, the victim was "hospitalized two times from severe stress." (At the trial in September 2014, the victim testified she "lost over 50 pounds in the last four months. [¶] I'm still stressed out.")

Defendant was charged by information with three felonies: criminal threats (Pen. Code, § 422, subd. (a)), stalking (§ 646.9, subd. (a)), and inflicting corporal injury on a person with whom he had a dating relationship (§ 273.5, subd. (a)). The information also alleged two prior serious or violent felony convictions (§ 245, subd. (a)(1)).

At trial, the jury heard the evidence we have just described.

7

At the close of the prosecution's evidence, defendant moved for a judgment of acquittal on all counts.  (Pen. Code, § 1118.1.)  As to the criminal threats count, defendant argued the prosecutor did not present sufficient evidence "that the criminal threat allegedly made on the 16th was immediate and unconditional; nor is there any corroborating evidence beyond the words of [the victim] to even show that such a thing existed."  The court denied the motion, finding "ample evidence" to go to the jury.  The court observed, as to the criminal threats, that no corroboration was necessary, "although there's ample circumstantial evidence of corroboration that [defendant] uttered threats.  Whether they were uttered particularly on that exact date is a little unclear, but, again, there doesn't have to be corroboration."

The defense presented no evidence.

On September 17, 2014, the court announced the jury had reached a verdict, and then raised the issue of defendant's prior convictions, as follows:

"Mr. Hoover, I have no idea what the verdict is.  I have not seen it, will not see it until it's handed over to me; however, in the event of an adverse verdict – that is a guilty verdict – on each one of the counts, we still have the issue of the prior convictions.  [¶]  [Defense counsel] indicated he spoke with you, and at this time you're willing to admit the prior convictions; is that correct?

"THE DEFENDANT:  Yes, sir, Your Honor.

"THE COURT:  All right.  Now, you do have the right to have a jury trial to determine the truth of those prior convictions.  In fact, you have the right to have this jury determine the truth of those prior convictions.  And at that jury trial you have the right to confront and cross-examine the witnesses, the right to remain silent, and the right to the subpoena power of the court.  Those are called your jury trial rights.  [¶]  Do you understand those rights?

"THE DEFENDANT:  Yes, sir, Your Honor.

"THE COURT:  Do you waive and give up those rights with respect to the priors?

"THE DEFENDANT:  Yes, sir, Your Honor.

"THE COURT: And do you admit that you suffered a prior conviction in case BA186571 for Penal Code section 245 -- 245, subdivision (a)(1) on September 22nd, 1992, in the Los Angeles Superior Court? [¶] Do you admit or deny?

"THE DEFENDANT: I admit.

"THE COURT: It's further alleged in the information that you suffered a prior conviction on January 21st, 1986, for the same offense, Penal Code section 245(a)(1), in Case No. A, as in apple, 633599. [¶] Do you admit or deny that prior conviction?

"THE DEFENDANT: Yes. Yes, sir, Your Honor.

"THE COURT: Admit or deny?

"THE DEFENDANT: I admit.

"THE COURT: Counsel, do you join in the admission?

"[DEFENSE COUNSEL]: I do, Your Honor.

"THE COURT: All right. The court finds the defendant understands the nature of the allegations alleged in the information, as well as the possible penalties and consequences, as well as the constitutional rights to a jury trial with respect to the prior convictions. And the court finds the prior convictions true."

The jury convicted defendant on all counts. The court sentenced defendant to 20 years eight months in prison (the high term of four years, doubled, on the domestic violence count; the midterm of eight months, doubled, on each of the other two counts, all to run consecutively; plus two consecutive five-year enhancements for defendant's two prior serious felony convictions (Pen. Code, § 667, subd. (a)(1)), and made other orders not at issue in this appeal.

## DISCUSSION

Defendant contends the court should have granted his Penal Code section 1118.1 motion for judgment of acquittal on the criminal threats count, and that his admission of his two prior convictions should be set aside. Neither claim has merit.

9

## 1.  Sufficiency of the Evidence of Criminal Threats

"In ruling on a motion for judgment of acquittal . . . , a trial court applies the same standard an appellate court applies in reviewing the sufficiency of the evidence to support a conviction, that is, ' "whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged." [Citations.]' [Citation.]  'Where the [Penal Code] section 1118.1 motion is made at the close of the prosecution's case-in-chief, the sufficiency of the evidence is tested as it stood at that point.' [Citation.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1212-1213.)

Substantial evidence is "evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." (*People v. Cole, supra,* 33 Cal.4th at p. 1212.)  "We review independently a trial court's ruling under [Penal Code] section 1118.1 that the evidence is sufficient to support a conviction." (*Id.* at p. 1213.)

In *People v. Toledo* (2001) 26 Cal.4th 221 (*Toledo*), the court "divide[d] the crime of criminal threat into five constituent elements . . . ." (*Id.* at p. 227.)  The prosecution must establish "all of the following:  (1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat--which may be 'made verbally, in writing, or by means of an electronic communication device'--was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances." (*Id.* at pp. 227-228, quoting Pen. Code, § 422, subd. (a).)

Defendant contends the evidence was insufficient to establish the fourth element: that the threat actually caused the victim to be in sustained fear for her own safety. Defendant points to the victim's testimony about the incidents in April, when she testified both that she was frightened and feared for her own and her children's lives, but also testified that, when she was talking to the police on the day of her 9-1-1 calls, "[a]t that moment, I wasn't afraid of him. I mean, I'm not afraid of him." Defendant also relies on Deputy Bautista's testimony that the victim told him that "she didn't feel threatened at the time," and "she kept telling me, no, she did not feel threatened. She kept telling me that she still loved him . . . ." (Deputy Bautista also testified that "[s]he said she wasn't being threatened at the time, but she felt scared because he kept calling.")

Defendant's reliance on testimony about the victim's reaction to the April incidents is unavailing. The record is clear that the criminal threats charge was founded on defendant's conduct in May, when the evidence showed that defendant, during the physical assault on the victim, and while he was choking her, said "if he couldn't have me, nobody could . . . ." The victim testified she understood that to mean that he was going to kill her, and that made her feel "scared." Then, over the telephone on May 16, defendant told the victim he was going to "put a bullet in [her] head."[3] As to that threat, the only direct evidence about the victim's reaction came from Deputy Bautista, who said that "[a]t that point, she said she did not fear for her life."

We have no difficulty concluding there was substantial evidence that both threats just described " 'actually caused the [victim] 'to be in sustained fear for . . . her own safety . . . .' " (*Toledo, supra,* 26 Cal.4th at pp. 227-228.) As to the first threat, we have the victim's own testimony that she was "scared" because she understood defendant's threat ("if he couldn't have me, nobody could") to mean he was going to kill her. The circumstances of the second threat – which occurred in the wake of a physical assault

---

**3**     The court gave a unanimity instruction stating that the defendant was charged with uttering criminal threats "sometime during the period of May 16, 2014," that the prosecution "may have presented evidence of more than one act to prove that defendant committed this offense," and that the jury had to agree on which act defendant committed.

causing the victim to be "distraught" and "glad to be leavin' with my life" – fully justified the inference that the victim continued to fear for her own safety. Deputy Bautista came to the victim's home at 10:00 on the evening of May 16, "in regards to a criminal-threats call," and the victim told him that defendant had threatened to "put a bullet in [her] head." This occurred on the same day she received 107 voicemail messages from him. It may be that the victim did not think defendant would actually go so far as to kill her, or it may be that she did not fear for her life "[a]t that point," because the police were present. But the evidence as a whole certainly permits (if not compels) the conclusion, beyond a reasonable doubt, that she continued to fear for her personal safety. There was no error in the trial court's denial of defendant's motion for acquittal.

**2.     Defendant's Prior Convictions**

Defendant's other contention is that his admission of his two prior convictions must be set aside because the record does not show the admissions were voluntary and intelligent under the totality of the circumstances. Specifically, defendant contends that, while the trial court advised him of his jury trial rights, the trial court "failed to advise him of the precise increase in the prison term that might be imposed, the effect on parole eligibility, and the possibility of being adjudged a habitual criminal as required by" Supreme Court precedents. Defendant relies on *In re Yurko* (1974) 10 Cal.3d 857, 862 (*Yurko*), and *People v. Cross* (2015) 61 Cal.4th 164, 179 (*Cross*). We disagree with defendant's conclusion.

**a.     The legal background**

The applicable principles are stated in *Yurko* and in *People v. Wrice* (1995) 38 Cal.App.4th 767, 770-771 (*Wrice*).

In *Yurko*, the court concluded, "as a judicially declared rule of criminal procedure," that an accused, before admitting a prior conviction allegation, must be advised of "the precise increase" in the prison term that might be imposed, the effect on parole eligibility, and the possibility of being adjudged an habitual criminal. (*Yurko, supra,* 10 Cal.3d at p. 864.) "The failure to so advise an accused in the enumerated instances will constitute error which, if prejudice appears, will require the setting aside of

12

a finding of the truth of an allegation of prior convictions." (*Ibid.*; see *Cross, supra,* 61 Cal.4th at pp. 170-171 [quoting *Yurko* and describing later precedents clarifying "that *Yurko* error is not reversible per se," and the test is whether the record affirmatively shows that a plea is voluntary and intelligent under the totality of the circumstances].)[4]

In *Wrice*, the Court of Appeal repeated the *Yurko* rule that a defendant who admits a prior criminal conviction "must first be advised of the increased sentence that might be imposed." (*Wrice, supra,* 38 Cal.App.4th at p. 770.) "However, unlike the admonition required for a waiver of constitutional rights, advisement of the penal consequences of admitting a prior conviction is not constitutionally mandated. Rather, it is a judicially declared rule of criminal procedure." (*Ibid.*; see *People v. Wright* (1987) 43 Cal.3d 487, 495 [" 'Unlike an uninformed waiver of the specified constitutional rights which renders a plea or admission involuntary . . . , an uninformed waiver based on the failure of the court to advise an accused of the consequences of an admission constitutes error which requires that the admission be set aside only if the error is prejudicial to the accused.' "].) *Wrice* continues: "Consequently, when the only error is a failure to advise of the penal consequences, the error is waived if not raised at or before sentencing." (*Wrice*, at pp. 770-771, citing *People v. Walker* (1991) 54 Cal.3d 1013, 1023 [same; "[u]pon a timely objection, the sentencing court must determine whether the error prejudiced the defendant, i.e., whether it is 'reasonably probable' the defendant would not have pleaded

---

[4] *Yurko* also held that the decisions in *Boykin v. Alabama* (1969) 395 U.S. 238 and *In re Tahl* (1969) 1 Cal.3d 122 apply to an accused's admission of prior felony convictions. (*Yurko, supra,* 10 Cal.3d at p. 863.) In *Boykin*, the high court held it was error to accept a guilty plea "without an affirmative showing that it was intelligent and voluntary." (*Boykin,* at p. 242.) The court explained that we cannot presume a defendant has waived three important constitutional rights – the privilege against compulsory self-incrimination, the right to trial by jury, and the right to confront one's accusers – from a silent record. (*Id.* at p. 243.) In *Tahl*, our own Supreme Court held that each of those three rights "must be specifically and expressly enumerated for the benefit of and waived by the accused prior to acceptance of his guilty plea." (*Tahl,* at p. 132.) In *People v. Howard* (1992) 1 Cal.4th 1132, the court changed the *Tahl* rule. (*Howard,* at p. 1178.) Now, while California still requires explicit admonitions and waivers, "a plea is valid if the record affirmatively shows that it is voluntary and intelligent under the totality of the circumstances." (*Id.* at p. 1175.)

guilty if properly advised"]; see *People v. Villalobos* (2012) 54 Cal.4th 177, 182 ["we have held that because 'advisement as to the consequences of a plea is not constitutionally mandated,' 'the error is waived absent a timely objection' "].)

### b. This case

In this case, defendant has forfeited his claim because he did not raise it at or before sentencing. In any event, no prejudice appears.

As respondent concedes, the trial court did not advise defendant of the precise penal consequences of his admissions. The record shows, however that defendant knew he faced a prison term well in excess of the 20-year eight-month sentence that was actually imposed.

First, before calling for a panel of prospective jurors to hear the case, the trial court discussed with defendant a plea offer from the prosecution. The prosecution had offered a six-year term in state prison and dismissal of the stalking and domestic violence charges in exchange for a plea to the criminal threats charge. Defendant told the court he understood the offer and had no questions about it. Then:

> "THE COURT: You do understand that if you are convicted of all of the offenses, you're looking at a substantial amount of time in prison. Quite frankly, you're looking at spending the rest of your life in prison. By my calculation, it would be somewhere between 35 to life and 85 to life. I actually think it's 85 to life, at this point. [¶] But the reason I'm not giving you exact numbers on that is because I haven't heard argument from the defense as to why a particular Code section, called 654, might or might not apply or how the third-strike law is interpreted. There's no question you're looking at life. The only question is how many years to life that you're looking at. [¶] You do understand that?
>
> "THE DEFENDANT: Yes, sir, Your Honor.
>
> "THE COURT: Do you have any questions about that?
>
> "THE DEFENDANT: No, Your Honor."

Second, after defendant was advised of his constitutional rights, waived those rights, and admitted his two prior convictions (on Sept. 17, 2014), the prosecutor filed a

14

sentencing memorandum seeking the maximum term, calculated to be 38 years four months to life. The memorandum expressly stated that defendant faced sentencing under the "Three Strikes" law, and that his two prior convictions added 10 years to his sentence. Defendant filed a sentencing memorandum requesting a sentence of 10 years eight months, and asking the court to strike his 1986 prior conviction based on its age.

The trial court struck the 1986 conviction at defendant's first sentencing hearing, but recalled the sentence and resentenced defendant several days later, imposing the five-year enhancements for both prior convictions. Defense counsel expressly conceded "that the imposition of the two five-year priors cannot be avoided," and asked the court to impose the low term on the domestic violence count and concurrent terms on the other two counts.

Thus the record shows this is a case like *Wrice*, where the court found the defendant "was not only aware of the increased penalties, but argued for leniency with that awareness," and "also did not object when the judge sentenced him." (*Wrice, supra,* 38 Cal.App.4th at p. 771; see *ibid.* ["Had the imposition of sentence on the enhancement allegations 'come as a genuine surprise, it would have been a simple matter to bring the issue to the attention of the trial court.' "].)

In sum, defendant forfeited his claim that he was not advised of the penal consequences of his admission of his prior convictions. Defendant cites *Cross* for the proposition that his claim cannot be forfeited, but *Cross* involved the trial court's acceptance of the defendant's stipulation, at trial, that he had suffered a prior domestic violence conviction, subjecting him to a longer prison term, "without advising [the defendant] of any trial rights or eliciting his waiver of those rights." (*Cross, supra,* 61 Cal.4th at p. 168; see *People v. Trujillo* (2015) 60 Cal.4th 850, 859 [forfeiture doctrine has no application to advisements of federal constitutional rights given a defendant before guilty plea is taken].) Here, defendant was fully advised of and waived his jury trial rights.

But even had defendant not forfeited his claim, the record is clear that the error did not prejudice him: that is, there is no reasonable probability that defendant would not

have admitted the truth of his prior convictions if the court had specifically advised him of the penal consequences when he made those admissions.  (Cf. *Wrice, supra,* 38 Cal.App.4th at p. 771, citing *People v. Walker, supra,* 54 Cal.3d at p. 1023.)  Defendant was aware before his trial began that he faced the possibility of either 35 years or 85 years to life in prison.  His claim that the record does not show his admissions were voluntary and intelligent is without merit.

## DISPOSITION

The judgment is affirmed.


GRIMES, J.

WE CONCUR:

BIGELOW, P. J.


RUBIN, J.